TOMANQUI KIRK, PLAINTIFF-RESPONDENT AND CROSS-AP-PELLANT, v. THE CITY OF NEWARK, A MUNICIPAL CORPO-RATION OF THE STATE OF NEW JERSEY; HUBERT WILLIAMS, DIRECTOR OF THE NEWARK POLICE DEPT.; CHARLES M. ZIZZA, CHIEF OF POLICE OF THE CITY OF NEWARK; JOHN DOE, DEPUTY CHIEF, NEWARK POLICE DEPT., YOUTH & COMMUNITY SERVICE DIVISION; AND JOHN DOE, CAPTAIN, NEWARK POLICE DEPT., YOUTH AID. BUREAU, DEFENDANTS, AND VIRGINIA CARDILLO, DE-TECTIVE, NEWARK POLICE DEPARTMENT, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.

Argued February 17, 1987—Decided January 25, 1988.

174

*John C. Pidgeon,* First Assistant Corporation Counsel, argued the cause for appellant and cross-respondent (*Glenn A. Grant,* Corporation Counsel, attorney).

*Isabelle R. Strauss* argued the cause for respondent and cross-appellant.

The opinion of the Court was delivered by

POLLOCK, Justice.

This appeal arises out of an action brought under 42 *U.S.C.A.* section 1983 (section 1983) by plaintiff, Tomanqui Kirk, against various defendants, including Virginia Cardillo, a Newark police detective. Kirk complains that Cardillo caused him to be arrested without probable cause in violation of the fourth and fourteenth amendments to the United States Constitution. The jury returned a verdict against Cardillo, but the trial court granted judgment notwithstanding the verdict in favor of Cardillo under Rule 4:40–2(a). The Appellate Division reversed and remanded the matter to the Law Division for a new trial. 212 *N.J.Super.* 201 (1986). We granted Cardillo's petition for certification, 107 *N.J.* 30 (1986), and Kirk's cross-petition, *id.* We reverse the judgment of the Appellate Division and reinstate the judgment of the Law Division.

–I–

By letter dated March 4, 1981, the Essex County Prosecutor's Office requested that the Newark Police Department investigate the February 4, 1981, scalding of a three-year-old child. Attached to the letter was the investigative report of a Division of Youth and Family Services (DYFS) caseworker and a medical report of Dr. F.W. Fuller, the treating physician. The DYFS report recited that the caseworker had examined the scene of the accident and interviewed the mother of the child and Kirk, who lived with them. According to the caseworker and Dr. Fuller, the burns were of "questionable origin."

At the time of the incident, Cardillo was employed by the Newark Police Department as a detective assigned to the Youth Aid Bureau. Her responsibilities included the investigation of child abuse and neglect. Cardillo verified the report with DYFS, and requested that Kirk come to her office. On March 12, 1981, Kirk met with Cardillo, waived his *Miranda* rights, and signed an exculpatory statement, in which he asserted that the scalding of the child resulted from the breaking of a

bathroom sink pipe. Kirk agreed to take a polygraph test, but no operator was available. Although a polygraph examination was scheduled for March 18, 1981, Kirk failed to appear for the examination.

Thereafter Cardillo met with an Essex County Assistant Prosecutor assigned to the Newark Municipal Court, who had the responsibility to decide the existence of probable cause. Acting upon the prosecutor's advice, Cardillo filed a criminal complaint against Kirk for aggravated assault. On March 23, 1981, Kirk was arrested and held in the Essex County Jail until he posted bail five days later.

On April 8, 1981, Cardillo spoke for the first time with Dr. Fuller and requested a more detailed report. In a letter dated April 14, 1981, Dr. Fuller advised Cardillo that, consistent with Kirk's version of the incident, the child's burns appeared to be accidental in nature. Cardillo related this information to the prosecutor's office, and in May 1981 the complaint against Kirk was voluntarily dismissed.

On March 21, 1983, Kirk filed a complaint under section 1983 [1] against the City of Newark, Police Director Hubert Williams, Chief of Police Charles Zizza, Detective Virginia Cardillo, and two unnamed John Doe defendants. Kirk claimed that in causing him to be arrested without probable cause, the defendants acted with a malicious, reckless, and negligent disregard of his constitutional rights. Before trial, the complaint was dismissed as to all defendants except Cardillo.

---

[1] 42 *U.S.C.A.* section 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

At the close of all of the evidence, Cardillo moved for entry of judgment pursuant to Rule 4:40–1. The court reserved decision on the motion and submitted the case to the jury, instructing that to find Cardillo liable, it must find that she acted without probable cause and with either malice or an intentional, deliberate, or reckless indifference to Kirk's constitutional rights. Additionally, the court instructed the jury that Cardillo would not be liable, even if Kirk proved all the elements of a section 1983 violation, if Cardillo acted in good faith or under the advice of counsel. The court, however, did not instruct the jury that if a reasonably well-trained police officer could have believed that probable cause to arrest Kirk existed, then Cardillo would not be liable.

The jury returned a verdict in the form of special interrogatories, finding that Cardillo filed the complaint against Kirk without probable cause. The jury found further that Cardillo filed the complaint not with malice, but with intentional, deliberate, or reckless indifference and disregard of Kirk's constitutional rights. As a result, the jury awarded Kirk damages of $10,000.

The trial court granted Cardillo's motion for a directed verdict under Rule 4:40–2(a), holding that Cardillo had probable cause as a matter of law. Without discussing the issues of immunity based upon advice of counsel or on the objective reasonableness of Cardillo's conduct, the court dismissed the complaint with prejudice.

The Appellate Division reversed and remanded for a new trial on all issues except malice, as to which the jury had found for Cardillo. 212 *N.J.Super.* at 207. The court held that except where no genuine issue of material fact exists, the issue of probable cause was for the jury, not the court. *Id.* Additionally, the court ruled that reliance on advice of counsel is a defense to a section 1983 action.

–II–

While this case has been wending its way through the judicial system, the United States Supreme Court has delivered two opinions that have substantially affected the rights of the parties and the role of courts in deciding section 1983 actions. Those decisions, *Malley v. Briggs*, 475 *U.S.* 335, 106 *S.Ct.* 1092, 89 *L.Ed.*2d 271 (1986), and *Anderson v. Creighton*, —— *U.S.* ——, 107 *S.Ct.* 3034, 97 *L.Ed.*2d 523 (1987), reveal that the Court has interpreted section 1983 to limit the rights of plaintiffs and to encourage disposition of the actions as a matter of law, at least when these actions arise out of an alleged unlawful arrest, search, or seizure by a law enforcement officer. To place those decisions in perspective, we review briefly the history of section 1983 actions.

Although enacted in 1871, section 1983 did not generate much litigation until 1961, when the United States Supreme Court ruled in *Monroe v. Pape*, 365 *U.S.* 167, 81 *S.Ct.* 473, 5 *L.Ed.*2d 492 (1961), that a state official could be liable under the statute for depriving another person of his or her federal constitutional rights. *See generally* Note, *Harlow v. Fitzgerald: The Lower Courts Implement the New Standard for Qualified Immunity Under Section 1983*, 132 *U.Pa.L.Rev.* 901 (1984) (*New Standard for Qualified Immunity*) (assessment of *Harlow*'s impact on the qualified immunity defense under section 1983). Six years after *Monroe v. Pape*, the Court recognized that such an official could defend against a section 1983 action by asserting a defense of qualified immunity. *Pierson v. Ray*, 386 *U.S.* 547, 87 *S.Ct.* 1213, 18 *L.Ed.*2d 288 (1967). Later the Court extended the defense to high-ranking state executives. *Scheuer v. Rhodes*, 416 *U.S.* 232, 94 *S.Ct.* 1683, 40 *L.Ed.*2d 90 (1974). Although *Scheuer* did not purport to define in detail the qualified-immunity defense, it intimated that the defense included both objective and subjective factors. *Id.* at 247–48, 94 *S.Ct.* at 1692, 40 *L.Ed.*2d at 103. Thereafter, the Court refined its definition to state explicitly that the defense included both factors. *Wood v. Strickland*, 420 *U.S.* 308, 322, 95 *S.Ct.* 992,

1000, 43 *L.Ed.*2d 214, 225 (1975). Thus, the qualified-immunity defense would be lost if the official knew or reasonably should have known that his or her action would violate plaintiff's clearly established constitutional rights or if he or she maliciously intended to deprive plaintiff of those rights. *Ibid. See generally* Note, *Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in Civil Rights Litigation, New Standard for Qualified Immunity,* 95 *Yale L.J.* 126, 130–31 (1985) (*Qualified Immunity for Government Officials*) (qualified immunity inquiry should be restructured as a purely legal question).

The trial court could determine as a matter of law on a motion for summary judgment whether the official's conduct had violated a clearly established constitutional right. *See New Standard for Qualified Immunity, supra,* 132 *U.Pa.L.Rev.* at 910. Whether the official had acted maliciously or whether the official actually knew that he or she had violated a clearly established constitutional right, however, produced questions of fact for the jury. *Qualified Immunity for Government Officials,* 95 *Yale L.J.* at 132. The result, as the Court has subsequently explained, was to expose government officials to the harassment and attendant costs of frivolous litigation. *Butz v. Economou,* 438 *U.S.* 478, 98 *S.Ct.* 2894, 57 *L.Ed.*2d 895 (1978); *Qualified Immunity for Government Officials,* 95 *Yale L.J.* at 132 n. 29. *Butz* involved a federal official, but since 1971, the Court has permitted suits against such officials for constitutional violations. *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 403 *U.S.* 388, 389, 91 *S.Ct.* 1999, 29 *L.Ed.*2d 619 (1971).

*Harlow v. Fitzgerald,* 457 *U.S.* 800, 102 *S.Ct.* 2727, 73 *L.Ed.*2d 396 (1982), involved an action by a civilian employee of the Department of the Air Force, who claimed that senior aides to President Nixon had conspired with the President in violation of the employee's first amendment rights to dismiss him in retaliation for testifying before a congressional committee about defense contract overruns. After rejecting defendant's

claim of absolute immunity, the *Harlow* Court addressed both the standard to determine claims of qualified immunity and the role of courts in making that determination. First, with respect to the standard, the Court excised the subjective test for overcoming the qualified immunity of government officials. No longer would it be possible for a plaintiff to overcome the "good-faith" defense of qualified immunity by establishing that a government official had acted with "malice." *Harlow, supra,* 457 *U.S.* at 817, 102 *S.Ct.* at 2737, 73 *L.Ed.*2d at 410. Second, until *Harlow,* by asserting that a government official had acted maliciously, a plaintiff could raise disputed questions of fact that precluded summary judgment and required resolution by the jury. *Id.* at 816, 102 *S.Ct.* at 2737, 73 *L.Ed.*2d at 409. The "substantial costs" that "attend the litigation of the subjective good faith of government officials," the court found, imposed too high a social cost. Henceforth, "bare allegations of malice," *id.* at 817, 102 *S.Ct.* at 2738, 73 *L.Ed.*2d at 410, would not suffice, and a government official would be entitled to qualified immunity unless his or her conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 *S.Ct.* at 2738, 73 *L.Ed.*2d at 410. The test was to be whether the currently applicable law was clearly established at the time the action occurred, an issue that could be determined on a motion for summary judgment. *Ibid.* By so formulating the test, the court intended to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Ibid.* If the law was clearly established, the immunity defense would ordinarily fail. *Id.* at 818–19, 102 *S.Ct.* at 2738, 73 *L.Ed.*2d at 411. Such was the state of the law when this matter was presented to the Law Division.

While the matter was pending in the Appellate Division, however, the United States Supreme Court decided *Malley v. Briggs, supra,* 475 *U.S.* 335, 106 *S.Ct.* 1092, 89 *L.Ed.*2d 271. Like the present case, *Malley* presented "the question of the degree of immunity accorded a defendant police officer in a

damage action under 42 *U.S.C.* section 1983 when it is alleged that the officer caused the plaintiffs to be unconstitutionally arrested * * * [without] probable cause." *Id.* at 337, 106 *S.Ct.* at 1094, 89 *L.Ed.*2d at 276. The defendant in *Malley* was a state trooper who improperly caused plaintiffs to be arrested in a drug raid. Writing for the Court, Justice White stated that the trooper "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Id.* at 341, 106 *S.Ct.* at 1096, 89 *L.Ed.*2d at 278. The Court held further "that the same standard of objective reasonableness that we applied in the context of a suppression hearing in [*United States v. Leon,* 468 *U.S.* 897, 104 *S.Ct.* 3405, 82 *L.Ed.*2d 677 (1984)] defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest." *Id.* at 344, 106 *S.Ct.* at 1098, 89 *L.Ed.*2d at 280 (footnote omitted). Thus the question becomes

whether a reasonably well-trained officer in [the state law enforcement official's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant. If such was the case, the officer's application for a warrant was not objectively reasonable, because it created the unnecessary danger of an unlawful arrest. [*Id.* at 345, 106 *S.Ct.* at 1098, 89 *L.Ed.*2d at 280.]

In the present case, the Appellate Division observed that "[t]he defendant's behavior was not tested by the 'objective reasonableness' standard outlined in *Malley* and *Leon.*" 212 *N.J.Super.* at 208. This omission by the Law Division led the Appellate Division to remand the matter for retrial.

Although we agree with the observation of the Appellate Division that the Law Division did not apply the objective-reasonableness test, the most recent decision of the United States Supreme Court, *Anderson v. Creighton, supra,* reflects the Court's commitment to the determination of section 1983 actions on motion. In that case, Anderson, an agent of the Federal Bureau of Investigation, conducted a warrantless search of defendant's home on the mistaken suspicion that the

defendant harbored a bank robber. The District Court found that Anderson had probable cause and granted his motion for summary judgment to dismiss the complaint. The Court of Appeals, however, found that because of fact questions about the existence of probable cause, the issue of the lawfulness of the search could not properly be decided on summary judgment. The Circuit Court held further that Anderson "was not entitled to summary judgment on qualified immunity grounds since the right Anderson was alleged to have violated—the right of persons to be protected from warrantless searches of their home unless the searching officers have probable cause and there are exigent circumstances—was clearly established." —— *U.S.* at ——, 107 *S.Ct.* at 3038, 97 *L.Ed.*2d at 529. In reversing, the United States Supreme Court explained *Harlow*'s requirement that the conduct of the government official violates a "clearly established" right of which a reasonable person would have known. 457 *U.S.* at 818, 102 *S.Ct.* at 2738, 73 *L.Ed.*2d at 410. Justice Scalia, who wrote the opinion of the Court, stated:

> The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates the Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests and vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what

he is doing violates that right. [— *U.S.* at ——, 107 *S.Ct.* at 3038–39, 97 *L.Ed.*2d at 530–31.]

Thus, the inquiry in *Anderson* centered on "the objective [albeit fact-specific] question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed." *Id.* at ——, 107 *S.Ct.* at 3040, 97 *L.Ed.*2d at 532. In answering the question, the Court declared that the law enforcement official "be permitted to argue that he is entitled to summary judgment on the ground that, in light of the clearly established principles governing warrantless searches, he could, as a matter of law, reasonably have believed that the search of the * * * home was lawful." *Id.* at ——, 107 *S.Ct.* at 3040, 97 *L.Ed.*2d at 532.

As a result, a law enforcement official can defend a section 1983 claim by establishing either that he or she acted with probable cause, or, even if probable cause did not exist, that a reasonable police officer could have believed in its existence. *Id.* at ——, 107 *S.Ct.* at 3052, 97 *L.Ed.*2d at 546 (Stevens, J., dissenting). So viewed, the import of *Anderson* is to provide law enforcement officials with both a belt and suspenders to uphold the qualified immunity defense. *See id.* at ——, 107 *S.Ct.* at 3049, 97 *L.Ed.*2d at 543 (Stevens J., dissenting).

Because the Court decided *Anderson* in the context of the Court of Appeal's reversal of the District Court's grant of summary judgment dismissing the complaint, the Court's analysis proceeds along the lines of the case at the summary judgment stage. By comparison, the present case comes to us on review of the Appellate Division's reversal of a judgment notwithstanding the verdict that had been granted by the trial court after a jury verdict for the plaintiff. In the future, we anticipate that similar cases will be presented for determination on motions for summary judgment. Nonetheless, when deciding a motion for a judgment notwithstanding a verdict, as when deciding a motion for summary judgment, "the court must

accept as true all the evidence which supports the position of the party defending against the motion and must accord him the benefit of all legitimate inferences which can be deduced therefrom, and if reasonable minds could differ, the motion must be denied." Pressler, *Current N.J. Court Rules,* comment *R.* 4:40–2 at 862 (1987); *Dolson v. Anastasia,* 55 *N.J.* 2, 5 (1969). Virtually the same test applies to a motion for summary judgment under which judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law. [*R.* 4:46–2.]

In either case, we believe *Anderson* calls for a judgment for the state law enforcement official as a matter of law when the official could reasonably have believed in the existence of probable cause.

◼ To establish a claim under section 1983, a plaintiff must prove that the defendant acted under color of state law and that the defendant deprived the plaintiff of a federal statutory or constitutional right. *Gomez v. Toledo,* 446 *U.S.* 635, 640, 100 *S.Ct.* 1920, 1923, 64 *L.Ed.*2d 572, 577 (1980). It is undisputed that Cardillo was acting under color of state law when she filed the criminal complaint against Kirk. Consequently, the only question is whether Cardillo deprived Kirk of his constitutional rights under the fourth and fourteenth amendments to the United States Constitution.

◼ The underlying proposition is that filing criminal charges without probable cause, like an arrest without probable cause, is a constitutional violation actionable under section 1983. *Losch v. Borough of Parkesburg,* 736 *F.*2d 903, 907 (3d Cir. 1984); *Patzig v. O'Neil,* 577 *F.*2d 841, 848 (3d Cir.1978). Generally speaking, the existence of probable cause depends on whether the law enforcement officials knew at the time that they acted of sufficient facts to lead a prudent person to believe that the plaintiff had committed, or was committing, an offense. *Beck v. Ohio,* 379 *U.S.* 89, 91, 85 *S.Ct.* 223, 225, 13

*L.Ed.*2d 142, 145 (1964). On a motion to suppress in a criminal case, the court decides the issue of probable cause. The question remains whether that issue, which often involves disputed facts, should be decided as a matter of law in a section 1983 action. In resolving that question, we are bound by decisions of the United States Supreme Court as the ultimate arbiter of federal legislation. *United States v. Gilbert Assoc.,* 345 *U.S.* 361, 363, 73 *S.Ct.* 701, 703, 97 *L.Ed.* 1071, 1075 (1953).

–III–

■ The first hurdle in this case is the determination whether the law of probable cause was clearly established at the time of the incident. *Anderson v. Creighton, supra.* We find that under both the United States and the New Jersey constitutions, the law of probable cause was clearly established at the time of the incident. *State v. Novembrino,* 105 *N.J.* 95, 106 (1987); *see also State v. Martin,* 87 *N.J.* 561, 567–68 (1987) (removal to police station and warrantless search of automobile justified where probable cause to believe that the vehicle contains contraband or evidence of criminal activity exists). Furthermore, the contours of the right were sufficiently clear that a reasonable official would understand whether she was violating that right. —— *U.S.* at ——, 107 *S.Ct.* at 3038–39, 97 *L.Ed.*2d at 530. Generally speaking, "probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Henry v. United States,* 361 *U.S.* 98, 100–02, 80 *S.Ct.* 168, 170–71, 4 *L.Ed.*2d 134, 136–38 (1959); *accord Beck v. Ohio, supra,* 379 *U.S.* at 91, 85 *S.Ct.* at 225, 13 *L.Ed.*2d at 145; *see also State v. Novembrino, supra,* 105 *N.J.* at 106 (state constitution forbids application of good faith exception to exclusionary rule). Under *Anderson v. Creighton, supra,* —— *U.S.* ——, 107 *S.Ct.* 3034, 97 *L.Ed.*2d 523, however, a clearly established law will not deprive a law enforcement official of the qualified immunity defense if, in light of the specific facts known by the official, he or she could reasonably believe that probable cause existed.

As *Harlow, Briggs,* and *Anderson* make clear, the determination of the objective reasonableness of the official's action will normally occur at the summary judgment stage. In the present case, however, the issue arises in the analogous context of a review of a judgment notwithstanding the verdict. Hence, we have the benefit of the testimony and evidence adduced at trial.

Our review of the record leads us to conclude as a matter of law that a reasonable police officer could have believed that Cardillo had probable cause to arrest. In reaching that result, we accept as true the evidence supporting the plaintiff's position and give plaintiff the benefit of all legitimate inferences that could be drawn therefrom. *R.* 4:40–2. Furthermore, we recognize, as did the Appellate Division, that "[p]rior to filing the complaint, defendant made no attempt to interview either the child, the mother, Dr. Fuller or attending nurses, nor did she visit plaintiff's apartment or inquire whether photographs had been taken." 212 *N.J.Super.* at 208. We are mindful, however, that the investigation focused on the possibility of the scalding of a three-year-old child by a man living with the child's mother. Cardillo read the DYFS report, confirmed that report with DYFS, interviewed defendant, and scheduled a polygraph test for him. Significantly, she reviewed her investigation with an assistant county prosecutor, who advised her that probable cause existed. In sum, Cardillo was confronted with a possible case of child abuse and acted on the advice of counsel. *Crowe v. Lucas,* 595 *F.*2d 985, 992 (5th Cir.1979). Consequently, we find that a reasonably well-trained police officer viewing the facts could have believed that she had probable cause to arrest defendant.

Our analysis of Kirk's fourth amendment claims applies also to his claim that Cardillo deprived him of his liberty without due process in violation of the fourteenth amendment. Kirk has not provided any authority to support the proposition that a police officer must exercise due diligence before making an arrest in the circumstances of this case. Instead, Kirk relies

on a Third Circuit opinion, *Davidson v. O'Lone*, 752 *F*.2d 817 (1984), which dealt not with the obligations of an arresting officer in conducting an investigation, but with those of the assistant superintendent of a prison in protecting one prisoner from another. The Third Circuit held that the superintendent's negligence did not work a deprivation of due process under the fourteenth amendment. In affirming, the United States Supreme Court noted that "[t]he guarantee of due process has never been understood to mean that the State must guarantee due care on the part of its officials." 474 *U.S.* 344, 348, 106 *S.Ct.* 668, 670, 88 *L.Ed.*2d 677, 683 (1986).

Kirk relies on *dictum* in the Third Circuit's opinion, stating that "actions may be brought * * * under Section 1983 when there has been infringement of a liberty interest by intentional conduct, gross negligence or reckless indifference." 752 *F*.2d at 840–41. That statement, however, does not support the proposition that a police officer who reasonably believes she has probable cause must conduct further investigation or risk a subsequent charge of failing to exercise due diligence. As a matter of law, we are persuaded that Cardillo could reasonably have believed that she had probable cause to arrest Kirk.

For Kirk to defeat Cardillo's assertion of the defense of qualified immunity, Kirk must show that the law was clearly established at the time of the incident. We cannot say that it was clearly established at that time, or even now, that an investigating officer, once she reasonably believes she has probable cause, must exercise due diligence before effecting an arrest. Such a rule could paralyze police and prevent them from acting to protect the public. Consequently, we find that Cardillo's qualified immunity provides a defense to Kirk's due process claim.

We reverse the judgment of the Appellate Division and reinstate the judgment of the Law Division dismissing the complaint notwithstanding the verdict.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.